UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ALDO RAMOS,

      Plaintiff,

v.                             Case No. 5:04-cv-275-Oc-10GRJ

DONALD A. MCKELVY, et al.,

      Defendants.

_____

## ORDER GRANTING SUMMARY JUDGMENT

Plaintiff initiated this case by filing a *pro se, in forma pauperis,* prisoner Civil Rights Complaint pursuant to 28 U.S.C. § 1331 and <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>[1], and is proceeding pursuant to an Amended Complaint (Doc. 53). Plaintiff names as Defendants nine individuals who were either employees or officials at federal prisons at the time of the events complained of, or officials of the Bureau of Prisons (BOP). In the Amended Complaint, Plaintiff contends that the Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution, and also violated his rights under the Americans with Disabilities Act and the Rehabilitation Act. Defendants have filed a Motion to Dismiss, or in the alternative for Summary Judgment (Docs. 58, 59), arguing *inter alia* that Plaintiff failed to exhaust his administrative remedies with respect to many of his claims and

---

[1] 403 U.S. 388 (1971).

has failed to demonstrate any violation of his Eighth Amendment rights.  For the following reasons, the Court concludes that summary judgment should be granted in Defendants' favor.

### The Amended Complaint

The allegations of Plaintiff's Amended Complaint (Doc. 53) may be summarized as follows.  Plaintiff alleges that he entered federal custody on September 3, 1993, commencing his incarceration at the Metropolitan Detention Center (MDC), a BOP facility in California.  Upon his intake, Plaintiff complained of pain and "instability" in his right arm, neck, and chest area, stemming from a gunshot wound that Plaintiff sustained in October 1992.  Over the course of the next several months, Plaintiff was examined by various medical personnel, and in January 1994 he was referred to a neurological specialist.  In February 1994 Plaintiff received a detailed neurological workup, which revealed "brachial plexus pathology", or nerve damage, and muscle atrophy resulting in impaired function of Plaintiff's right hand.  Physical therapy and a brace were recommended.  Plaintiff subsequently attended sick call in March 1994 and was advised to do exercises.  From April 1994 until November 1994 Plaintiff was seen and treated on various occasions for gastritis/abdominal pain, and pain in his hand, wrist, and arm.  Plaintiff contends that he signed up for sick call over 45 times while at MDC.  Plaintiff does not allege that he pursued any administrative remedies concerning his medical care while at MDC.

From November 1994 until June 2000, Plaintiff was incarcerated at USP

2

Lompoc, California.   According to the Complaint, Plaintiff requested sick call at Lompoc on November 15, 1994, complaining of pain in his neck, right arm, and hand.     Plaintiff acknowledges that he saw a physician's assistant (PA), but he alleges that he did not see a physician until April 1995.   Plaintiff alleges that he began physical therapy "without much success," and continued to complain of pain until he received a hand splint in May 1996.   He was also referred to an orthopedic surgeon, who recommended a new splint, "consider tendon transfer," and pain medication (Naproxen).   Plaintiff continued to complain of pain and immobility in his right hand and arm.   In June 1997, Plaintiff was still in pain and was again referred to an orthopedist, who Plaintiff alleges directed that Plaintiff should be transferred to a Federal Medical Center (FMC) for a   consult with a hand surgeon, though the orthopedist also noted "poor prognosis."   Plaintiff alleges that northing further was done until June 1998, when he was assigned to another physician, Dr. Spada,  who "managed his care to a significant degree."   Dr. Spada referred Plaintiff to the FMC and the prison Clinical Director intitiated a transfer request.   However, Plaintiff's designation to the FMC was denied in March 1999 due to "population pressures at the medical referral centers."

Plaintiff continued to complain of pain, and he alleges that he was not prescribed the pain medication Naproxen until September 28, 1999, though he did receive other medication.  Plaintiff alleges that in January 2000, the Lompoc Clinical Director tried to get Plaintiff to sign a medical treatment refusal form, which Plaintiff

refused to sign.  Plaintiff was advised that his referral for transfer to the FMC had been denied.  Plaintiff alleges that in retaliation for not signing the refusal form, the Clinical Director wrote a medical evaluation stating that Plaintiff had some functional use of his right arm, shoulder, and hand and had made "remarkable improvement." The Clinical Director recommended that Plaintiff continue with exercises, and noted that nerve and tendon transplant was not a viable option since the injury was seven years old.  Plaintiff alleges that he did not receive needed physical therapy at Lompoc, nor was the right type of hand brace provided.  He also alleges that he was denied dental care.  Plaintiff does not allege that he pursued any administrative remedies concerning his medical care at Lompoc.

In June 2000, Plaintiff was transferred to USP Atlanta.  He was evaluated on June 29, 2000, and the staff physician noted that "inmate has residual right upper trunk (to include arm) paralysis.  There is also a residual loss of sensation in upper right extremity.  There is still loss of grip strength of right hand."  The staff physician recommended a neurological consultation.  Plaintiff was seen in the chronic care clinic in July 2000.  Plaintiff received x-rays in September 2000, and in November 2000 the neurological referral was changed to a referral for physical therapy. Plaintiff alleges that he remained in pain but did not see a physical therapist for evaluation until February 2001.  Plaintiff alleges that he did not receive a brace or physical therapy.  Plaintiff does not allege that he pursued administrative remedies concerning his medical care at USP Atlanta.

4

In March 2001 Plaintiff was transferred to FCI Edgefield, South Carolina. Upon intake, he advised the medical staff of tooth and gum trouble, gall bladder trouble, kidney stones and blood in his urine, painful shoulder and hand, nerve injury with paralysis, pain in his right hand, arm, shoulder and neck, and the fact that Plaintiff had been advised to have hand surgery.  Plaintiff was not examined until April 2001.  Defendant Dr. Serrano, Clinical Director at Edgefield, advised Plaintiff that there was not a good treatment for his hand paralysis because of permanent neurological damage.  After Plaintiff objected, Dr. Serrano referred Plaintiff to a neurologist and prescribed medication.

Plaintiff alleges that on April 27, 2001, he fractured his right fourth finger and received x-rays and pain medication.  The radiologist noted "probable nondisplaced fracture involving the base of the distal phalanx," and suggested further diagnostic evaluation, but the Clinical Director denied further evaluation because "Patient has no control of right hand."

In May 2001, Plaintiff was evaluated by neurologist, Dr. Epstein, who concluded with respect to Plaintiff's hand that "it was unlikely that any intervention or treatment at this juncture will reverse the sensorimotor loss."   Dr. Epstein recommended treatment with Amitriptyline to relieve neurologic pain, followed by Neurontin if Plaintiff continued to experience pain.  Dr. Epstein also stated "any surgical intervention for neurolysis or interposition grafting of lower trunk injuries is almost never successful, even when performed acutely and is utterly unlikely to help

this late in his course."

In June 2001, Plaintiff complained to Dr. Serrano that the Amitriptyline made him "zombie like" and he feared for his personal safety. Dr. Serrano reduced Plaintiff's dosage. Plaintiff was seen again by Dr. Epstein for further testing, and Dr. Epstein concluded that "there may be an element of carpal tunnel syndrome." Plaintiff alleges that Dr. Serrano never advised him that he had carpal tunnel syndrome.

In August 2001, Plaintiff was examined at Edgefield by Defendant Dr. Korwin concerning the side effects of Plaintiff's medication. Dr. Korwin noted that Plaintiff is left-handed, that the condition of his right arm and hand was "chronic," and that Plaintiff felt Dr. Korwin was too "negative." Dr. Korwin had Plaintiff sign a refusal form in order to discontinue the Amitriptyline and refuse treatment with Gabapentin (Neurontin), which Dr. Korwin also recommended. Plaintiff alleges, however, that he was refused alternative treatment.

In September 2001, Plaintiff again saw Dr. Korwin with complaints of pain, and Dr. Korwin noted that Plaintiff does not take medication as it makes him drowsy, and that Plaintiff needed Amitriptyline and Gabapentin. At Plaintiff's request, Dr. Korwin prescribed an alternative, sulindac (Clinoril). Plaintiff alleges that he did not receive follow-up care by either Korwin or Serrano, and that he was taken off of chronic care altogether because he complained about the side effects of the medication.

In December 2001, Plaintiff was treated for a urinary tract infection with

6

antibiotics and told to drink more water.  In January 2002, Plaintiff was seen for a tooth ache and recommended for a crown.  In March 2002, Plaintiff complained of pain during urination and was treated with antibiotics and again told to drink water, an x-ray showed no abnormalities.  The PA's report noted that an excretory urogram might be necessary if symptoms persisted.

Plaintiff alleges that Serrano and Korwin effectively cut him off of all pain medication and treatment for his right hand, arm, chest, and neck, thereby putting his life at risk.  He alleges that he was denied a consultation with an orthopedic hand surgeon specialist.  He alleges that he was denied care with respect to: a crown for his tooth, further diagnostics of his broken finger, and an excretory urogram.  He alleges that he should have been referred to an FMC, but instead was transferred to USP Coleman in February 2002.  Plaintiff does not allege that he pursued any administrative remedies at Edgefield.

Upon arrival at Coleman, Plaintiff renewed his complaints of pain stemming from the gunshot wound, tooth and gum trouble, shoulder and hand pain, painful urniation, and nerve injury with paralysis.  He informed medical staff at Coleman that he had been advised to have surgery on his right hand, and he requested to see a doctor.  Plaintiff alleges that Defendant PA Chipi did not note his complaints and chronic illnesses, and recommended no medication or evaluation.  Plaintiff was placed in the SHU pending classification.

From September 4, 2002, to September 26, 2002, Plaintiff alleges that he

7

submitted four requests to medical staff concerning mouth pain.  He was not seen until January 2003, when the chief dental officer noted "occasional food retention due to inability to floss" and advised Plaintiff to rinse after eating.  In December 2002, Plaintiff was seen by PA Delalamon for right hand and arm pain; the PA noted that he would consult with the Clinical Director to see if Plaintiff could be given pain medication.   In June 2003 Plaintiff was diagnosed with gastroesophageal reflux disease and treated with two different medications after the first medication did not relieve his symptoms.

Plaintiff alleges that in November 2003 he pursued administrative remedies seeking surgery for his right hand; his administrative remedy requests were denied at all levels.  In February 2004 he was seen by PA Chipi for pain and for his right hand, and PA Chipi informed him that because he had metal bullet fragments in his neck and thorax an MRI could not be performed.

Plaintiff attended sick call on three occasions in March 2004, complaining of pain, athlete's foot, and reflux.  A barium swallow had been ordered in December 2003, but not performed.  In April 2004, Plaintiff pursued administrative remedies seeking a barium swallow, ultrasound, and CAT scan.  Plaintiff was seen by prison medical staff in April 2004, but he alleges that as of the date of the Amended Complaint (May 2005) no tests had been performed.  At midnight on April 18, 2004, Plaintiff complained of severe abdominal pain and blood in his urine, but no PA was available to see him until 6:00 a.m.  Plaintiff was diagnosed with a urinary tract

infection.  He alleges that the PA ordered further testing, which was not performed until December 2004.

In June 2004 and July 2004, Plaintiff sought treatment for reflux and pain and requested upper endoscopy or other tests.   Plaintiff's reflux medication was adjusted.  Plaintiff continued to seek treatment for pain and reflux, and in September 2004 Defendant Dr. Tidwell requested a referral for a gastroenterologist.

Plaintiff contends that he "has been denied proper treatment for his right and arm other than medication that does not alleviate his pain.  As of April of 2005, [Plaintiff] still has not had his reconstructive surgery on his right hand.  He has not been seen by an internist or gastroenterologist . . . nor has he received proper treatment by Dentist who ordered two crowns."

Plaintiff alleges that Defendants have shown deliberate indifference to his serious medical needs, and have denied Plaintiff rights guaranteed under the Americans with Disabilities Act and the Rehabilitation Act.  Plaintiff requests an injunction requiring treatment by a hand surgeon "to attempt to give Plaintiff 90% of his motor skills", by a gastroenterologist to carry out all "necessary interventions or treatment and corrective surgical operations in order to cure plaintiff," and by a "qualified dentist who will restore all of plaintiff's teeth."  Plaintiff also seeks monetary damages.

## Defendants' Motion

Defendants contend that any of Plaintiff's claims that were not administratively exhausted must be dismissed (Doc. 58), including his claims concerning dental treatment and his claims under the ADA and Rehabilitation Act.  Defendants also contend that Plaintiff cannot demonstrate that Defendants were deliberately indifferent to his serious medical needs.[2]  Defendants' Motion is supported by affidavits and other exhibits (Doc. 59).  Plaintiff was advised that failure to properly controvert the Defendants' summary-judgment evidence could result in the facts asserted by Defendants as being accepted as true.  Plaintiff was advised that he could not rely solely on the allegations of the Complaint and other pleadings in opposing summary judgment (Doc. 60).  Plaintiff has filed a response opposing Defendants' motion, supported by his own affidavit and documents (Docs. 73, 74, 75).

## Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. Rule 56(c).  In applying the standard for summary judgment, the Court

---

[2]It is unnecessary to address Defendants' other arguments for dismissal or summary judgment because all of the claims in the Complaint may be resolved as to all Defendants on the basis of exhaustion and failure to demonstrate deliberate indifference.

10

must review all the evidence "in the light most favorable to the nonmoving party."[3] The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. [4]

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.[5]  If the Court finds that the movant has satisfied the initial burden, the burden shifts to the non-moving party to provide sufficient evidence of every element he or she is required to prove at trial.[6]  If the party who has the burden of proof at trial fails to establish even one essential element of the case, "there can be no genuine issue as to any material fact" because the failure to establish one essential element "renders all other facts immaterial." Id. The nonmoving party must go "beyond the pleadings, [and show] that there exist genuine issues of material fact."[7]

## Exhaustion of Remedies

On April 26, 1996, the President signed into law the Prison Litigation Reform Act which amended The Civil Rights of Institutionalized Persons Act, 42 U.S.C.

---

[3]  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[4]  Anderson v. Liberty Lobby, 477 U.S. 242  (1986).

[5]  Celotex, 477 U.S. at 323.

[6]  Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993), reh'g and reh'g en banc denied, 16 F.3d 1233 (11th Cir. 1994).

[7]  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56 (1986).

§ 1997e to read as follows:

> (a) Applicability of Administrative Remedies. No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

"Congress now has mandated exhaustion in section 1997e(a) and there is no longer discretion to waive the exhaustion requirement." Alexander v. Hawk, 159 F.3d 1321, 1325 (11th Cir. 1998); see also Booth v. Churner, 532 U.S. 731, 741 (2001) (finding that Congress has mandated exhaustion of administrative remedies, regardless of the relief offered through the administrative procedures). In determining whether a plaintiff has exhausted his administrative remedies, a court does "not review the effectiveness of those remedies, but rather whether remedies were available and exhausted." Miller v. Tanner, 196 F.3d 1190, 1193 (11th Cir. 1999) (citing Alexander, 159 F.3d at 1326).

In Alexander, the Eleventh Circuit noted seven important policies favoring an exhaustion of remedies requirement:

> (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the

> courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."

159 F.3d at 1327 (citation omitted).

The Bureau of Prisons (BOP) makes available to its inmates a three level administrative remedy process if informal resolution procedures fail to achieve sufficient results. The administrative remedy process is begun by filing a Request for Administrative Remedy at the institution where the inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal by filing a Regional Administrative Remedy Appeal with the Regional Office for the geographic region in which the inmate's institution of confinement is located. (For an inmate at the Federal Correctional Complex in Coleman, Florida, this appeal would be filed with the Southeast Regional Office of the BOP in Atlanta, Georgia.) Finally, if the Regional Office denies relief, the inmate can appeal that decision to the Office of General Counsel via a Central Office Administrative Remedy Appeal.

In his opposition to Defendants' Motion, Plaintiff notes that he has pursued administrative remedies with respect to the following claims: that he should receive surgery to repair his right hand (remedy number 318011-F1); that he needed further diagnostic testing for his reflux and to address the metal fragments in his body (remedy number 330205). There is no dispute that Plaintiff exhausted his administrative remedies as to those issues.

13

Plaintiff further contends, however, that he exhausted his claim concerning denial of dental treatment.  Plaintiff's administrative remedy documents reflect that he filed a request seeking to have his teeth cleaned in December 2003 (remedy number 320595).  On January 15, 2004, the request was granted and Plaintiff was advised that the chief dental officer "will try to get your teeth cleaned within the next two weeks."  Plaintiff's documents do not support his assertion that he exhausted his administrative remedy request with respect to any claim that he was denied any necessary dental restoration services.   Accordingly, the Court concludes that Plaintiff's claims pertaining to such care must be dismissed.

Further, Plaintiff argues that remedy number 330205, pertaining to diagnostic testing, served to exhaust his claims under the ADA.  In his Central Office Remedy Appeal of that claim, Plaintiff conclusionally argued "I believe my chronic medical history is very serious which he is in clear violation of my Eighth Amendment Right under the United State Constitution.  Title II of the Americans with Disabilities Act."  To the extent that this statement can be construed as making any claim under the ADA, it was not initiated at the institutional level and therefore did not comply with the BOP's administrative remedy process.  Plaintiff also argues that he exhausted "access to programming" claims via another administrative remedy process, number 332634.  However, Plaintiff's administrative remedy documents in that proceeding reflect only that he challenged his continued detention in the SHU, not the denial of any right to medical care or to ADA accommodations.   Accordingly, the Court

14

concludes that Plaintiff's ADA/Rehabilitation Act claims are unexhausted and must be dismissed.[8]

Thus, the Court concludes that the only claims asserted by Plaintiff that have been administratively exhausted are : (1) a claim that the medical staff at USP Coleman were deliberately indifferent to his serious medical needs in connection with the treatment of Plaintiff's right hand (exhausted via remedy number 318011-F1); and (2) a claim that the medical staff at USP Coleman were deliberately indifferent to his serious medical needs in connection with his requests for diagnostic tests (barium swallow, ultrasound, CAT scan) (exhausted via remedy number 330205-F1).

## Eighth Amendment Violation

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  "Prison personnel may not subject inmates to acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs . . . .  [S]uch deliberate indifference by a correctional system to the serious medical needs of its prisoners constitutes the kind of unnecessary and wanton infliction of pain that is proscribed by the Eighth Amendment."[9]   In Estelle v. Gamble[10] the Supreme Court explained that:

---

[8] Moreover, Plaintiff's Amended Complaint fails to allege any facts showing that Plaintiff has any rights under the ADA or the Rehabilitation Act, or that Defendants violated any such rights.

[9] Harris v. Thigpen, 941 F.2d 1495, 1504-1505 (11th Cir. 1991) (citations omitted).

[10] 429 U.S. 97, 105-06 (1976).

> [A] complaint that a physician has been negligent in
> diagnosing or treating a medical condition does not state
> a valid claim of medical mistreatment under the Eighth
> Amendment.  Medical malpractice does not become a
> constitutional violation merely because the victim is a
> prisoner.  In order to state a cognizable claim, a prisoner
> must allege acts or omissions sufficiently harmful to
> evidence deliberate indifference to serious medical needs.
> It is only such indifference that can offend 'evolving
> standards of decency' in violation of the Eighth
> Amendment.

According to the sworn declaration of USP Coleman Clinical Director Dr. Mark Tidwell, Plaintiff's medical records reflect that BOP staff provided ongoing monitoring of Plaintiff's complaints of pain stemming from his gunshot wounds.  See Doc. 59-4. In April 2001, while Plaintiff was at Edgefield, neurologist Dr. Franklin Epstein examined Plaintiff and diagnosed "permanent neurological damage to hand nerves [with] atrophy and contracture."  Id.  Dr. Epstein recommended pain management with medication (Amitriptyline and Neurontin).  Dr. Epstein's report reflects the following opinion: "Unfortunately, any surgical intervention for neurolysis or interposition grafting of lower trunk injuries is almost never successful, even when performed acutely and is utterly unlikely to help this late in his course."

Dr. Tidwell stated that Plaintiff's medical records show that in August 2001 he refused continued treatment with those medications due to the side effects.  Id. Plaintiff was seen in Chronic Care at Edgefield in September 2001, at which time he was prescribed Sulindac for pain.  In October 2001, he was again seen in Chronic Care and again prescribed Neurontin (Gabapentin).  During a visit in December

16

2001, Plaintiff reported "using Gabapentin daily only when he has pain which is very rare," and was counseled to take the medication daily.  Id.  Plaintiff's medical records do not reflect any further complaints of pain stemming from the gunshot wounds while at Edgefield.  Id.

Upon Plaintiff's admission to Coleman in August 2002, Plaintiff received a medical screening at which he reported no present medical complaints and no need for referral to see a physician.   Plaintiff was evaluated in December 2002 for complaints of pain in his right arm; no medication was prescribed.  Although Plaintiff presented at sick call for other complaints, he did not complain of pain again until July 2003 when he complained of right shoulder pain and received ibuprofen.   In September 2003, Plaintiff was treated for acid reflux.  In December 2003, Plaintiff complained of throat pain and was evaluated and treated by medical staff approximately 16 times between January 2004 and September 2004.  Only twice during that time did Plaintiff complain of pain stemming from his gunshot wounds; he was prescribed acetaminophen following those complaints.

Dr. Tidwell stated that Plaintiff's primary medical complaint since October 2004 related to symptoms associated with gastroesophageal reflux disease, for which Plaintiff was prescribed Proton pump inhibitors (such as rabeprazolel and omeprozole).  Plaintiff also was given a barium swallow test and was recommended for upper endoscopy (as of June 2005, the date of the declaration).   Dr. Tidwell stated that "[t]o the best of my knowledge, all medical complaints by [Plaintiff] are

being addressed as he raises them."

PA Chipi also provided a sworn declaration.  Doc. 59-4.  PA Chipi stated that Plaintiff reported no medical complaints at the time of his intake to Coleman.  PA Chipi examined Plaintiff on multiple occasions for acid reflux and other complaints, and prescribed Plaintiff tylenol when he complained of shoulder pain stemming from his prior gunshot wound.

Plaintiff's "affidavit" in opposition to the Defendants' motion is an unsworn and lengthy chronology of his medical history beginning in 1993, in which he quotes verbatim from the medical records and his administrative remedy requests.  See Doc. 73.  Plaintiff's affidavit is largely repetitive of the allegations in the Amended Complaint.

Based on the declarations and documentary evidence presented, the Court concludes that Defendants have met their summary-judgment burden of showing that there is no genuine issue of fact concerning whether Defendants were deliberately indifferent to Plaintiff's serious medical needs.  Assuming that all of the needs complained of by Plaintiff are "serious,"[11] the record reflects that Defendants responded to and addressed Plaintiff's medical complaints.  Plaintiff's arguments in opposition amount to no more than a disagreement with the treatment decisions of

---

[11] Arguably, Plaintiff's claim concerning his need for hand surgery does not amount to a "serious" medical need in light of the consulting neurologist's opinion that such surgery would not help Plaintiff.  See Farrow v. West, 320 F.3d 1235, 1343 (11th Cir. 2003) ("serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

the prison medical personnel.  Such disagreement does not rise to the level of a constitutional violation.[12]  Although a delay of treatment may in some instances amount to a constitutional violation, Plaintiff has presented no competent summary judgment evidence showing that any alleged delay of treatment or in ordering diagnostic tests for any of his complaints was for a non-medical or other improper purpose.[13]   Accordingly, the Court concludes that Defendants are entitled to judgment as a matter of law.

## Conclusion

The Defendants' Motion (Doc. 58) is **GRANTED,** and this case is hereby **DISMISSED with  prejudice**.  The Clerk of the Court shall terminate all pending motions, enter judgment dismissing this case with prejudice, and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** at Ocala, Florida, this 7th day of April 2006.

_____

UNITED STATES DISTRICT JUDGE

c:   Aldo Ramos
     Counsel of Record

---

[12]  See Estelle, 429 U.S. at 105-06.

[13]  See Farrow, 320 F.3d at 1246.

19